## Herring, Appellant, *v.* H. W. Walker Company.

Argued September 27, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*Archibald M. Matthews,* for appellant.

*Charles H. Coffroth,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 13, 1962:

J. E. Herring, trading and doing business as the J. E. Herring Motor Company, in Somerset, is engaged in the automobile sales and service business, his premises adjoining the establishment of the H. W. Walker, Inc., a corporation, which is engaged in the industry of producing condensed milk, powdered milk, ice cream and related dairy products to the extent of three million pounds per year.

As a result of the defendant company's processes a quantity of its evaporated products escapes into the open air and falls where it will, depending mostly on wind currents and other atmospheric conditions. J. E. Herring complains that most of it comes to rest on his premises and that it does considerable damage to his property and particularly the automobiles he has for sale and which are on display outside his building. He complains also that the defendant uses machinery which is operated by steam through the consumption of bituminous coal and that in consequence clouds of smoke emerge from the stacks above the boilers and that this smoke, carrying ash, soot and other deleterious substances, finds an affinity with his automobiles, to the mechanical and over-all detriment of the vehicles.

Accordingly he filed a complaint in equity in the Court of Common Pleas of Somerset County asking that the court enjoin the defendant company from discharging its vaporous and other wastes on to his premises and his automobiles. The defendant answered and the cause came on for a hearing.

After the taking of testimony the chancellor reached a finding that only a small quantity of the milk powder residue issued from the defendant company's operations and that the "defendant has taken such steps as are currently known to the industry to prevent as much escape thereof as possible." He ordered, however, a further hearing on the problem of smoke, soot and ash. After this second hearing, the court affirmed its original finding on the milk powder and refused an injunction on the smoke, soot and ash. It said: "The defendant has expended comparatively large sums of money in the procuring of the best mechanical devices under the advice of professional engineering services in an attempt to reduce the exhaust fallout and deposit of smoke, soot, fly ash and powdered milk on adjoining properties, particularly that of plaintiff, and, in those endeavors defendant has reduced the deposit of those substances to a practical minimum.

"The deposit of smoke, soot, fly ash and powdered milk from defendant's processing plant upon the plaintiff's property and his personal property thereon is to the plaintiff an annoyance which annoyance is damnum absque injuria."

We are not satisfied that the record supports these findings. The testimony in fact would show rather clearly that (1) the discharge of smoke, soot, fly ash and powdered milk from the defendant's plant is considerable, not negligible; (2) that this fallout causes not just annoyance but a serious and substantial interference with the plaintiff's use of his premises; and (3) that the defendant did not sustain its burden of

proving that this constant aerial wastage was an unavoidable consequence of its operations or an injury which could have been prevented only by an expenditure which would have substantially deprived it of the use of its property.

The plaintiff introduced in evidence photographs which clearly reveal that the milk powder residue, smoke, ash and cinders make up a deposit which is considerable in quantity. He testified in detail as to how the invading substances affect his business and property. He said that the constantly sifting foreign materials drizzle on to his property in such volume that he must employ three persons to sweep, brush and clean up his establishment; that every morning he finds at least an accumulation of one shovelful of fly ash in his showroom; that "there is one show window that you can't get it off at all any more, the one on the south side of the building, just like it would have been sand blasted, just burns into it very much like little pin holes through it;" that the cars he has on display must be washed daily and sometimes two and three times a day. He amplified that unless the cars are cleansed regularly the powder will turn into a "sticky substance" and that "after the sun hits it long enough it will discolor the paint, there is nothing you can do but to repaint it." He added that the "fly ash gums the works in everything." And that all this affects the saleability of his automobiles.

A state policeman (Gerald L. Johnson) testified that in an automobile he purchased from the plaintiff he found that the drains on the air vents were clogged with "cinders and more like mud baked in the drains there, clear solid, no water could get through." This witness further testified from his personal knowledge that cinders were discharged from the defendant's smoke stack, that "There was a continuous flow of cinders coming over there, they flew around, small black

cinders," and that the cinders were not only lodged in the drains of the car he had purchased but also "in behind the chrome strips, around the windows, and around the trunk, the trunk lid, and the door frames and interior, even in the interior underneath the seats and floor mats, and things was pretty much of a mess."

A Mr. Oppey, pharmacist and chemist, testified that the accumulation scraped from several used cars of the plaintiff contained calcium, sodium, potassium, phosphorus, and burnt sugar, minerals found in cow's milk, which substances, he stated, because of the acid reaction, caused discoloration of paint. A sheet metal contractor testified that the fly ash ate into spouts and drains on the plaintiff's property. A chemical engineer, Emerson Venable, testified to finding fly ash and noting its damaging effect on the spouts. He testified further that the discharge of the fly ash could easily be controlled by the installation of mechanical collectors.

The plaintiff's bookkeeper testified in detail as to the deleterious effect of the powdery, sooty rain upon the plaintiff's property, his office equipment, and the work being performed by them. Other witnesses, whose testimony it is unnecessary to recite, added to the evidence of the damage wrought by the defendant's operations. The photographs, as already indicated, corroborated the plaintiff's evidence and substantiated his contentions.

It is difficult to perceive how, with the evidence before it, the court could conclude that "it appears the amount of smoke, soot, fly ash and powdered milk, upon their automobiles, if any, is negligible and in no way harmful."

J. B. Neilan, a civil engineer, qualified and experienced in the field of smoke control and milk processing plants, testified that several methods were available to the defendant to minimize the discharge of the milk

powder residue. He spoke of equipment manufactured by the American Air Filter Company which he saw in actual operation at another milk processing plant (Beatrice Foods) in Ohio, which equipment, in his opinion, if properly installed and operated would eliminate up to 90% of the complained-of discharge. He testified further of the existence of equipment which could trap most of the fly ash in the stack itself.

The defendant produced the sales representative of the Blawnox Company which had manufactured and installed the equipment in its plant. He testified that he had watched the defendant's operations for a period of fifteen minutes and concluded that his equipment was "much more efficient than the average installation and as efficient as we sell today." This testimony from an obviously interested salesman of equipment, especially when based on only a fifteen minute period of observation, can hardly outbalance the photographic and disinterested as well as interested testimony presented by the plaintiff that a considerable amount of milk powder was discharged from defendant's stack onto plaintiff's property and that other methods do exist to reduce this discharge.

Neilan, the chemist already mentioned, testified that he would rate the Blawnox unit as removing only 60 to 65% of the milk powder being emitted. He was well qualified as an expert witness. A graduate of the Carnegie Institute of Technology, with graduate work at Harvard University, he had thirteen years' work in practical engineering and was experienced both in the field of smoke control and milk processing.

The defendant introduced no evidence that it had studied other methods of collecting the milk powder residue or that it had inquired of other milk processing plants as to their experiences with this problem. Its attitude in this respect was reflected in the testimony of its president: "Q. In the drying process of milk you

say you remove the moisture from the milk? A. That is right. Q. Is it possible to conduct that process without discharging some solids and residue? A. I haven't seen any yet that has been done without, to my knowledge there is none. Q. It would seem from your testimony then that there is a necessary discharge of solids incumbent to the milk drying process, is that true? A. That is the way it has worked out for us."

The president did not say that such discharge was inevitable in all milk processing plants; he said only that it was a necessary concomitant of his own particular operation.

When his son, Earl Berkey, vice president and manager of the company, was asked on the witness stand whether new machines could accomplish more in meeting the problem of the exhaust fallout, he replied: "They say the new machines the collection percentage is about identical to the type we have." He did not state, however, that he had ever attempted to obtain reliable information on how the new machines would operate in his plant. As to the fly ash, he said that "a certain amount of normal smoke with fly ash, a certain amount comes out any coal fire boiler," and that the cost of converting both boilers to gas would be prohibitive. He admitted that the efficiency of the cyclone collector in use at their plant depended upon proper cleaning and draft regulation by the employees, and that if the workers did not properly cleanse, adjust and regulate the draft, milk solids would emerge from the stack. He also admitted that there existed equipment which would eliminate smoke, fly ash and soot but did not know how much such equipment would cost and whether it would be prohibitive in running the defendant's business.

The court below erroneously assumed, as a reading of its opinion after the first hearing shows, that it was the duty of the plaintiff to come forward with convinc-

ing testimony or evidence which established as a fact the defendant had not taken every reasonable means to prevent the conditions of which he complains. However, the law has long been clear that in cases of this kind the burden is on the defendant to show that the use of his property which causes injury to the complaining property owner is unavoidable or cannot be prevented except by an expenditure which would substantially deprive him of the use of his own property.

In *Beecher v. Dull*, 294 Pa. 17, this Court said: "The former class of cases applies the rule that damages resulting to another from a natural and lawful use by a person of his own premises, are, in the absence of malice or negligence, damages without remedy, while the latter adopts the common law principle that one must so use his property as not to injure that of another. Cases necessarily arise where these two opposing rules conflict, and when this occurs the right to use one's own property must prevail, *providing the resulting damage to another can not be avoided, or only at such expense as would be practically prohibitive to a person in the enjoyment of his own land:* Pfeiffer v. Brown, supra. In applying these rules, the court said in the above case (page 274) : 'If the expense of preventing the damage from his [the aggressor's] act is such as practically to counterbalance the expected profit or benefit, then it is clearly unreasonable, and beyond what he could justly be called upon to assume. If, on the other hand, however large in actual amount, it is small in proportion to the gain to himself, it is reasonable in regard to his neighbor's rights, and he should pay it to prevent the damage, or should make compensation for the injury done. Between these two extremes lies a debatable region where the cases must stand upon their own facts, under the only general rule that can be laid down in advance, that the expense required would so detract from the purpose

and benefit of the contemplated act, as to be a substantial deprivation of the right to the use of one's own property. If damage could have been prevented short of this it is injuria which will sustain an action.' See also P. R. R. v. Sagamore Coal Co., 281 Pa. 233.

*"The burden was on defendants to show that the use of their property which caused the injury to plaintiffs was unavoidable or could not have been prevented except by an expenditure which would have substantially deprived them of the use of their property*: McCune v. Pittsburgh & Baltimore Coal Co., 238 Pa. 83, 89. . . . The evidence is not clear, however, to what extent the use of small blasts would decrease the profit. . . . *The evidence as a whole is insufficient to justify the conclusion that it was impractical for defendants to conduct their business at a profit without continuance of the injuries complained of* . . ." (Emphasis supplied)

In *McCune v. Pittsburgh & B. C. Co.,* 238 Pa. 83, 89, we affirmed per curiam the lower court's holding: "But as to the proposition whether it is practicable to otherwise drain the mine, the evidence is neither clear nor convincing. *As the burden is on the defendant, it should show with reasonable clearness that its mine cannot be properly operated without injury to the plaintiff's land* . . .

"The case did not proceed exactly along such lines, but no matter how it proceeded, *the burden remains on the defendant to show that the injury was not to be avoided by reasonable care and expenditure* . . .

*"The defendant has failed to establish that the injury was unavoidable or to prevent it would necessitate such expense as would deprive it of the use of its property* . . .

*"It follows, therefore, that the general rule must apply, and that the defendant must use its own property*

*so as to avoid injury to the plaintiff.*" (Emphasis supplied.)

When the above-stated rule is applied to the instant case, the conclusion is inescapable that under the present state of the record, the defendant did not meet its burden. However, in view of the fact that the court below erred in not properly placing the burden as required by law, the defendant should be given an opportunity to meet it. Therefore, the record is remanded for a further hearing. A reasonable opportunity should be afforded the defendant to investigate methods available for the reduction of the emission of the milk and smoke, soot and ash complained of, and the feasibility of installing such methods. If such methods do exist and may be installed in the defendant's plant at an expense which would not cause the defendant to cease operations (because of prohibitive expense) the defendant must be required to make such installation. If it fails to do so, the injunction must then issue as prayed for.

The decree of the lower court is vacated with directions that, after supplemental hearing, it enter a decree not inconsistent with this opinion.

Each party to bear own costs.

---

Dissenting Opinion by Mr. Justice Eagen:

I must dissent.

The findings of fact in the court below are founded upon substantial testimony. It is not for us to pass upon the credibility of the witnesses or to determine the weight to be given the testimony: *Shydlinski v. Vogt,* 406 Pa. 534, 179 A. 2d 240 (1962). A reading of the record will disclose that the Majority accept as gospel truth the testimony offered on behalf of the

plaintiff and completely ignores the evidence offered in contradiction. This is beyond our function.

Moreover, I am convinced that the defendant has utilized all reasonable means to conduct its business in a manner that will prevent annoyance and damage to the plaintiff and others in the neighborhood. This is all it is required to do under the law. See, *Ebur v. Alloy Metal Wire Co.*, 304 Pa. 177, 155 A. 280 (1931); and, *Hannum v. Gruber*, 346 Pa. 417, 31 A. 2d 99 (1943).