Commonwealth of Pennsylvania, Appellant, *v.* Wyeth Laboratories, Division of American Home Products Corporation, Appellee.

228

Argued October 1, 1973, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-
SON, JR., MENCER, ROGERS and BLATT.

*Hershel J. Richman,* Special Assistant Attorney
General, for appellant.

*Richard E. McDevitt,* with him *Eugene I. Caffrey* and *Montgomery, McCracken, Walker & Rhoads,* for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, February 27, 1974:

Wyeth Laboratories (Wyeth) owns property in the Borough of West Chester, Chester County, where it is engaged in the manufacture of chemical products. This property was purchased by Wyeth for this purpose in 1948, but prior thereto, the property was used by the Borough as a public dump and pest house. *Inter alia,* waste gypsum, other chemicals, and other trash and refuse were dumped onto this property prior to Wyeth's purchase. Due to the underlying nonpermeable clay-type soil of the property (six to eight feet thick), flowing subsurface waters are under pressure, and consequently large amounts of pressurized, underground percolating waters drain throughout the vicinity of the Wyeth property. Two unnamed streams flow into the property from the north and east, join on the property, and exit the property at the southern boundary, soon to flow into an unnamed tributary of Goose Creek, and from there into Goose Creek itself.

In 1956, at the request of West Chester Borough, Wyeth encased in porous concrete pipes the two above mentioned streams along the natural courses of the rivulets. One of the pipes runs directly through the former dump. The subsurface waters percolating through the former dump site have picked up pollutants (called leachate), and said waters have seeped through the somewhat porous concrete pipes to intermingle with the waters of the encased streams. The quality of the waters that are encased in the pipes, therefore, is degraded as the streams pass through Wyeth's property.

Acting through the Department of Environmental Resources (DER), the Commonwealth filed a com-

plaint in equity in the Court of Common Pleas of Chester County seeking a mandatory injunction requiring Wyeth to abate the pollution of the encased streams, alleging it to be a public nuisance. This complaint contained two counts. The first count invoked the provisions of Section 401 of The Clean Streams Law, Act of June 22, 1937, P. L. 1987, *as amended,* 35 P.S. §691.401 (Supp. 1973-1974), and alleged therein that Wyeth had permitted contaminated percolating waters to intermingle with the uncontaminated encased streams, thereby permitting water pollution to occur on its property. The second count invoked the provisions of Section 301 of the same statute, 35 P.S. §691.301 (Supp. 1973-1974), regarding discharge of industrial waste, but relief sought under this count was abandoned by the Commonwealth during the course of litigation.

Incident to its complaint in equity, Commonwealth filed a motion for preliminary injunction, which after hearing, was refused as the lower court was not then satisfied that the Commonwealth's right to the relief it sought was clear.

At the trial on the merits, the Commonwealth's experts confronted Wyeth's experts on the issue of how the waters were being polluted; where the source of the pollution was; what, if any, pollution abatement systems had been, or were being implemented; and how effective those systems were.

The Commonwealth introduced expert testimony from the Director of Engineering for Chester County Health Department, Thomas H. Cahill, who was experienced in the design and construction of sanitary and storm sewers, and was familiar with the conditions existing on the Wyeth property. By testing, Mr. Cahill concluded that a severe pollutant was being discharged into the encased streams flowing through the Wyeth property. He could not, however, identify the specific

area where discharge of pollutants was taking place on the Wyeth property. Rather, he pointed to *potential* catch basins on the Wyeth property where pollutants might have collected in the event of leakage or spillage from chemical storage tanks and from various valves, which could possibly have seeped into subsurface waters via a storm sewerage system. This is purely speculative and of no probative value.

Testimony by the Regional Sanitary Engineer of DER, Christian Beechwood, was directed toward possible solution of Wyeth's pollution problems. He advanced one of several alternatives available to Wyeth, to wit, intercepting the waters flowing onto the Wyeth property from the north and east and re-routing them away from the Wyeth property. Further, he suggested the possibility of collecting pollutant discharges and treating them before discharging them into Commonwealth waters.

The Commonwealth introduced testimony from an aquatic ecologist, who noted that the normal aquatic life was absent from the streams' waters below the point from which they exited the Wyeth property. He did not state where pollution specifically originated; he did not offer a solution to the condition of the streams. Joseph P. Smurda, Assistant Director of Water Control in DER, next testified to the degradation of the streams as they crossed through Wyeth's property, but he did not identify the specific source of pollution. Dr. Robert Schoenberger, Professor of Environment at Drexel University, identified the probable sources of the stream pollution to be sundry organic and inorganic substances, some of which had also been found on the Wyeth property.

Wyeth introduced in defense expert testimony from its sanitary engineer, who explained that no industrial waste drained into the storm sewer system and that extreme measures had been taken to protect against accidental chemical discharge into storm sewer lines.

Wyeth's waste water treatment system effectively channeled waste effluent into the borough treatment plant.

Next, William Elias, Director of the Wyeth plant, testified that in 1958 Wyeth had constructed a waste treatment plant at a cost of $200,000 and had made an addition in 1968 at a cost of $400,000. This plant treated all waste penicillin broth, all organic chemical reactions, and all solvents emanating from both operations. An internal department of environmental control had been established with an annual budget of $125,000. Weekly tests, daily observations employing standard methods of water analysis were routine. In 1956, Wyeth had constructed forty-eight inch piping, concrete reinforced, with cemented joints, to direct the flow of the two unnamed streams (referred to in the complaint) across its property to a discharge point off of its property. After explaining the above pollution abatement systems, he told of the difficulties Wyeth had experienced in excavating and constructing in and about the former dump site and told of the nature and contents of the dump. Surface waters from many sources (other than the two streams alluded to in the complaint) flowed across the Wyeth property during rainfalls, seeped into the ground of the former dump where the decomposing compost remained.

Harold Loughhead, Manager of Wyeth's Environmental Control Department, testified that he had tested the waters entering and leaving Wyeth's property for years, and he disputed the facts, the parameters of pollution, and the conclusions of Commonwealth witnesses. Mr. Loughhead believed that the isolated tests of the Commonwealth were not nearly as significant as the many tests run by Wyeth. He found that the biological oxygen demand[1] and the chemical oxygen de-

---

[1] Biological oxygen demand is that oxygen required to biologically oxidize the organic matter present in any given sample of water. (N.T., hearing January 20, 1971, p. 233.)

mand[2] on the waters entering and leaving the Wyeth property varied considerably on different testing dates. He concluded that if any trend was to be discerned, it was that the water leaving the property has become of increasingly better quality over the years. In his opinion, Wyeth's construction had covered up much of the land to eliminate percolation; Wyeth had improved transfer lines to carry uncontaminated water from the property; and biological decomposition of the dump's compost was very nearly exhausted. Dye tests revealed no intermingling of discharge from the sanitary sewer system with the storm sewer system. As to the feasibility of collecting streams via piping in order to bypass the former dump site completely, Mr. Loughhead testified that this would disrupt Wyeth's structures and buildings considerably.

The court below entered a decree nisi which determined that Wyeth was in violation of Section 401 of The Clean Streams Law and that Wyeth was legally responsible for the abatement of the public nuisance "if abatement thereof can be reasonably accomplished under all the circumstances." Jurisdiction of the case was retained by the court below to permit both parties if they so desired to submit appropriate abatement proposals within sixty days of the decree. Abatement proposals were to include specific estimates of the costs of installation and construction, the costs of operation, and the time required to put them into effect. The appeal is before us on dismissal of the Commonwealth's exceptions.

The only issue presented to this Court is whether the equity court below, having determined that Wyeth (appellee here) is in violation of Section 401 of The Clean Streams Law, erred as a matter of law in enter-

---

[2] Chemical oxygen demand is that oxygen required to chemically oxidize the organic matter in any given sample of water. (N.T., hearing January 20, 1971, p. 299.)

ing a decree nisi which (1) makes appellee responsible for the abatement if it can be reasonably accomplished under all the circumstances, (2) retains jurisdiction to review abatement proposals, and (3) causes the appellant to suffer dismissal if no abatement plans are submitted. Appellant contends that the substance of this decree (1) directly contravenes Section 401 and its legislative intent, (2) is founded upon a clear error of law, and (3) is without adequate factual basis. We shall deal with the last of these contentions first.

In determining whether there is an adequate factual basis for that portion of the decree which retained jurisdiction in the court below to review submitted abatement proposals, we review its findings of fact and conclusions of law in accordance with our scope of review. This Court has previously dealt with the issue of appellate review vis-a-vis injunction.

"In reviewing the lower court's action in issuing an injunction, our scope of review, as with other types of equity matters is limited, ' " (W)e will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: . . . ." [Citations omitted.]' " *Armstrong School District v. Armstrong Education Association,* 5 Pa. Commonwealth Ct. 378, 382, 291 A. 2d 120, 123 (1972).

We have set forth above most of what is in the record. These facts and circumstances adequately support the court's conclusions and its decree. Due to the conflicting nature of expert testimony, conflicting evaluations as to the feasibility of any one of the abatement proposals, and evidence that other avenues of abatement remain unexplored, the chancellor had more than sufficient reason to require more concrete abatement pro-

posals supported by studies in order to fairly formulate a decree.

In arguing that the final decree below is founded upon a clear error of law, appellant appears to be objecting to the consequences of the decree. Specifically, appellant fears that the court below has thrust upon it the burden of developing specific plans for the abatement of Wyeth's nuisance, or suffer dismissal of the complaint. The Commonwealth also expresses concern that, under the decree, it must divert its technical resources to the resolution of this pollution problem, which resources are allegedly "limited and already overburdened." While this may be true, this is nonjusticiable.

The narrow scope of our inquiry is whether the lower court, consistent with the powers and responsibilities of a court of equity concerning the abatement of public nuisances, erred in its final decree. An examination of the case law on the subject is necessary as the relevant provisions of The Clean Streams Law afford little guidance. Section 601 of this statute reads in pertinent part: "(a) Any activity or condition declared by this act to be a nuisance, shall be abatable in the manner provided by law or equity for the abatement of public nuisances. . . . [T]he court may, in its decree, fix a reasonable time during which the person or municipality responsible for the nuisances may make provision for the abatement of the same." Act of June 22, 1937, P. L. 1987, art. VI, §601, as amended, 35 P.S. §691.601 (Supp. 1973-1974).

Given simply the statutory declaration that conditions and activities stated to be nuisances by the Act are abatable as public nuisances in the manner provided by law, and statutory recognition that a court may allow a reasonable time in which to abate a nuisance, the more perplexing problems associated with abatement of nuisances are left unanswered.

Keeping in mind that the Commonwealth initiated this suit in equity and that the court below has found a violation of Section 401 to exist, our initial inquiry is into the general equitable principles to be considered. It is well settled that " ' "The power of the courts to issue injunction should be exercised with great caution and only where the reason and necessity therefor are clearly established." . . .' [Citation omitted.] 'It lies on a party who asks for a decree, the effect of which, if granted, is to bind his adversary hand and foot, to make out a clear case, of at least preponderating equity. He has no case if his equity is doubtful. . . .' " *Commonwealth v. National Gettysburg Battlefield Tower, Inc.,* 8 Pa. Commonwealth Ct. 231, 248, 302 A. 2d 886, 894 (1973), *aff'd on other grounds,* 454 Pa. 193, 311 A. 2d 588 (1973).

Furthermore, it is well settled that ". . . ' "An injunction is not of right, and the chancellor is not bound to make a decree which will do far more mischief and work greater injury than the loss he is asked to redress." "A suitor must not only appear in a court of equity with clean hands, but he must come with reasonable promptness, in good faith, and with a just and equitable demand. . . . If an injunction is prayed for where, upon a consideration of the whole case, it ought not in good conscience to issue, a mere legal right in the plaintiff will not move the chancellor." [Citation omitted.]' " *Moyerman v. Glanzberg,* 391 Pa. 387, 393, 138 A. 2d 681, 684 (1958).

The case law in Pennsylvania is clear that a landowner enjoys the right to use his own property in a lawful and natural manner even though damages occur as a result of the lawful and natural use. While, under certain circumstances, he may also have a corresponding duty to abate a nuisance created as a result of a lawful use, if the resulting damage to another because of the nuisance cannot be avoided, or only at

such expense as would be practically prohibitive to a person in the enjoyment of his own land, he may not be required to abate the nuisance. *Beecher v. Dull,* 294 Pa. 17, 21, 143 A. 498, 499 (1928) ; *McCune v. Pittsburgh & B. C. Co.,* 238 Pa. 83, 89, 85 A. 1102, 1104 (1913). This being the law, it was very proper for the court below to take the obvious step of retaining jurisdiction to inquire into whether the resulting damage could be avoided and whether the expense to abate would be practically prohibitive.

This brings us to the nub of this case. The Commonwealth insists that the court below has imposed upon it a heavier burden than either the statutory or the case law provides. Relying heavily on *Herring v. H. W. Walker Co.,* 409 Pa. 126, 185 A. 2d 565 (1962), the Commonwealth advances the theory that the case law places the burden *on the defendant* to show that the use of his property which causes the public nuisance is unavoidable and cannot be prevented except by an expenditure which would substantially deprive him of the use of his own property, and that the case law *does not* place upon the Commonwealth the burden to produce feasible abatement proposals.

In *Herring,* an individual plaintiff sought injunctive relief against an individual defendant, who was actively polluting the air with by-product exhaust, smoke, soot, and ash. These obnoxious by-products settled on plaintiff's property and had a deleterious effect on his retail merchandise. The Supreme Court in *Herring* reversed the lower court's denial of injunctive relief, and stated that the record made in the lower court did not support the lower court's finding that the annoyance was a loss which did not give rise to an action in the legal sense (damnum absque injuria). The Supreme Court stated that because Pennsylvania law placed the burden upon the defendant to show that the injury to the plaintiff was unavoidable, and that because the rec-

ord clearly showed that the defendant had not carried that burden, denial of injunctive relief was improper at that time. If the defendant could show that the injury to the plaintiff was unavoidable, then deniel of relief would be proper. If defendant could not so show, then injunctive relief in favor of the plaintiff would be proper. The Commonwealth interpolates this rule of law into the instant case in order to advance the following reasoning: there being a conclusion of law that Wyeth has violated Section 401 of The Clean Streams Law by allowing a public nuisance to exist on its property, the burden now shifts to Wyeth to show how abatement can most feasibly be accomplished, if at all.

Before discussing the merits of this reasoning, it is important to inquire into the origins of the *Herring* rule. The rule which places the burden on the defendant to show that the injury to plaintiff resulting from a natural and lawful use of the land is unavoidable was first announced by the Pennsylvania Supreme Court in *McCune v. Pittsburgh & B. C. Co., supra* (also cited in Commonwealth's brief). This was a suit in equity in which plaintiff-farmer sought to enjoin defendant-mine operator from pumping subsurface mine waters to the surface and discharging them into a clean stream which flowed across plaintiff's land, thereby destroying the stream for domestic and farming purposes. While the active pollution of the stream was not in serious dispute, whether the defendant should be required to abate the pollution was in serious doubt because the expense to abate was in dispute; defendant's experts claimed it was prohibitive, plaintiff's experts claimed it was not. Recognizing that the injury done to the plaintiff was substantial, the Court rejected defendant's argument that plaintiff's loss was damnum absque injuria. The *McCune* Court indicated that the plaintiff's loss was caused by the defendant's action which included artificially diverting mine waters from their natural flow,

collecting them, pumping them from the subsurface to the higher surface, and then discharging them into a pure stream. Having found the plaintiff's injury to be substantial, the *McCune* Court further concluded that the defendant had failed to establish that the injury was unavoidable or prohibitively expensive, and, therefore, the defendant was not allowed to claim that its actions were blameless.[3]

However, the facts of *McCune* and *Herring* are distinguishable from the instant case in every important aspect. In those cases each of the defendants was engaged in an affirmative act of pollution to the substantial detriment of the welfare of the plaintiffs. In the instant case, while Wyeth has been declared to be in violation of Section 401, it has been so declared simply because of its ownership of land and for conditions created and existing long prior to its ownership. Nor can we ignore the fact that Wyeth, incident to its acquisition and development of the land in question, did what was requested by public authorities to cope with the problem as it was then recognized, and throughout its ownership and use of said land had done nothing affirmatively to aggravate the condition. To the contrary, the record demonstrates its concern to avoid aggravating the pollution causing condition and to avoid new or different pollution problems incident to its use of the land and activity carried on at the site.

Where a plaintiff establishes that a defendant is actively polluting to the substantial detriment of the

---

[3] The defendant in *McCune* had hoped to rely on the well-known *Pa. Coal Co. v. Sanderson* decision, 113 Pa. 126, 6 A. 453 (1886), in support of its contention that the injury was damnum absque injuria. But in *Sanderson* a mine operator defendant was found to be *not* liable for water pollution where *natural* forces of gravity caused his mine drainage to flow into an *already polluted* stream. The *McCune* Court found that the facts of *McCune* and *Sanderson* were distinguishable.

plaintiff or to the interests of the public, the *McCune* rule should apply. However, here the power and resources of the Commonwealth are being brought to bear upon one not affirmatively polluting the environment and blameless with respect to the conditions producing the pollution and simply because of its ownership of the land alleged to be the source of the pollution. In such a context, the burden of proving that abatement is not possible or is practically prohibitive should not fall upon the shoulders of the landowner who in any given case could be an individual of modest means or one of substantial affluence. Rather, the Commonwealth in seeking abatement under these circumstances should have the burden of proving the feasibility of the very relief it seeks.

In the instant case the lower court certainly does not abuse its discretion in concluding that the record fell short of proving a feasible abatement plan from which it could formulate an equitable decree of abatement. In light of the burden which, in our opinion, the Commonwealth must bear in this class of abatement cases, the lower court properly required the Commonwealth to submit a plan of abatement or suffer dismissal of its complaint.

Decree affirmed.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. I would have had great difficulty under the factual situation of this case in concluding, as did the lower court, that Wyeth was in violation of Section 401 of The Clean Streams Law.[1] However, the correctness of that determination is not challenged in this appeal and is accepted by the majority. Consequently, the abatement provisions of Section 601 of The Clean Streams Law[2] control, and the burden is

---

[1] Act of June 22, 1937, P. L. 1987, as amended, 35 P.S. §691.401.
[2] 35 P.S. §691.601.

upon Wyeth to abate the nuisance or to show that abatement cannot be accomplished except by an expenditure which would substantially deprive it of the use of its property. *See Herring v. H. W. Walker Company*, 409 Pa. 126, 185 A. 2d 565 (1962).

I would sustain the Commonwealth's exceptions to the lower court's decree nisi insofar as the decree nisi would result in the dismissal of the Commonwealth's complaint upon failure of both parties to submit abatement plans within the time allowed. Further, I would remand the case to the lower court to fix a reasonable time during which Wyeth may make provisions for the abatement of the nuisance found by the lower court to exist or establish that abatement cannot be accomplished except by an expenditure which would substantially deprive it of the use of its property. If Wyeth were to fail to meet its burden in regard to one or the other of these alternatives, the injunction sought by the Commonwealth should issue.

Judge BLATT joins in this dissent.