16436

CARTER ET AL. v. LAKE CITY BASEBALL CLUB, INC., ET AL.
(62 S. E. (2d) 470)

Messrs. *Samuel Want, Sam Rogol* and *Leroy M. Want,* of Darlington, *for Appellants*

*Messrs. A. W. Wimberly,* of Lake City, and *McEachin, Townsend & Zeigler,* of Florence, *for Respondents,*

November 27, 1950.

FISHBURNE, Justice.

This action was instituted by the appellants for themselves and others similarly situated, against the Lake City Baseball Club, Inc., a Corporation, and the trustees of Lake City School District, for the purpose of obtaining the injunctive process of the court to prevent the respondents, school trustees, from leasing or otherwise permitting the use of the athletic field of the school for the playing of professional baseball at night by the respondent baseball club.

Two legal propositions of unusual interest and importance are presented by the appeal: (1) That the trustees are without power to lease or permit the use of the school athletic field for night professional baseball, especially under the circumstances of this case; and (2) That the conditions shown by the testimony to exist, are such as to render the playing of professional baseball at night on the athletic field a private nuisance.

A reference was dispensed with. The circuit judge heard the testimony in open court, and thereafter filed his decree, adjudging as a matter of law that the trustees of the school district possess the power to lease and permit the use of the athletic grounds for professional baseball; and that, subject to compliance by respondents with certain conditions stated in the order, the appellants are not entitled to injunctive relief on the ground of a private nuisance against the use of the athletic field for the playing of professional baseball at night under the circumstances disclosed by the testimony. Accordingly, he dissolved the temporary restraining order granted at the time of the institution of the action, and dismissed the complaint.

The complaint alleges in substance that during the years 1947, 1948 and 1949, the school athletic field, which is immediately in the rear of the public school buildings, was leased by the trustees to the Lake City Baseball Club for the playing of professional baseball at night during the baseball season. For the years 1947 and 1948 there was a written lease, and it was extended and authorized by the trustees for the year 1949, but no written instrument by way of renewal was executed.

A return and answer was filed by the trustees, but they have no counsel of record. In the body of their pleading it is set forth that this board prays the court to enter judgment defining its powers and authority in the premises.

The return and answer of the Baseball Club is in effect a general denial of the allegations of the complaint respecting

the nuisance features of the complaint, and a rejection of the contention of the appellants that the respondent trustees are without power to lease the athletic field for the purposes in question.

The school lot is situated in the town of Lake City, a town of about 5,000 population, on the north side of Main Street. The school buildings face on this street, and extend back a distance of about 170 feet. The physical property is bounded on the North by Dancing Street; on the East by Blanding Street; and on the West by Carolina Avenue. The nuisance angle of the case is presented and emphasized by the plaintiffs and others whose homes border on the school grounds and the athletic field. The residences on Dancing Street, which is about 40 feet wide, face the rear of the ball field. The bleachers and grandstand are on the eastern side of the athletic field, and are just about ten feet from the rear of the residential lots on Blanding Street.

Before discussing the issue of nuisance we will consider the right and power of the respondent school trustees to lease the athletic field.

The Lake City Baseball Club, which is a member of the Palmetto League, was chartered by the state as a business corporation in April, 1947, with a capital stock of $5,000.00, divided into 500 shares of the par value of $10.00 each, with a board of directors and the usual corporate officers. There are about fifty stockholders, most of whom live in and around Lake City. While this corporation is amenable to suit, it is insolvent. The testimony shows that it is kept alive in its operation largely by local contributions; that it now owes a thousand dollars, and has assets of only $2.75. The respondent Board of Trustees is not liable to a law action. *Brooks v. One Motor Bus,* 190 S. C. 379, 3 S. E. (2d) 42. It is therefore apparent that any damage and injury sustained by appellants is irreparable, and that the only relief available to appellants, if

they are entitled to any, is through the injunctive process of the court of equity.

The school trustees executed a written lease to the Lake City Baseball Club, Inc., under date May 10, 1947. It is stated in the lease that the athletic field is leased to the Baseball Club "for the purpose of, and at the times needed, to play baseball games in connection with its schedule with Palmetto League, and such other extra games as the lessee may schedule, for the term of the 1947 baseball season." The lessee is given the right to renew the contract for the 1948 season "jointly with the American Legion Team, if the American Legion decides to sponsor a team, and, if not, then to this lessee alone, but upon such terms as may hereafter be agreed upon between the parties." (The American Legion did not sponsor a team and the lease contract enured to the sole benefit of the Lake City Baseball Club, Inc.)

The lessee is given the right, at its own expense, to erect poles and fixtures on the premises for the purpose of flood-lighting the field for night games; and also the right to erect seats, bleachers and grandstands and other helpful improvements, but upon the stipulation that all such improvements and equipment will be left on the premises as the property of the lessor upon the termination of the lease. The lessee is also granted the right to sublet concessions for use while games are being played, but the lessor is not to receive any of the funds earned in such connection. Under the terms of the lease, the use of the athletic field house, showers and lockers for the convenience of the teams and of visiting teams, is afforded the lessee. The lessee agrees to pay for water and electricity used during the games and to keep the premises in good repair.

The lease, as stated, was verbally renewed for the 1949 season.

The appellant property owners are not contesting in any way the use of the athletic field for school activities, or the casual or occasional use of the field for athletic contests which may have a commercial aspect. Nor do they contend that the operation of a commercial baseball park is a nuisance per se. They deny the power of the school trustees to become contractual parties to an operation which they charge constitutes a public or private nuisance.

There are several applicable statues in the Code dealing with the powers of school trustees in connection with the public schools of the state, but we need consider only Section 5358, sub-division 6, entitled "Control school property", which vests the school trustees with the power "to take care of, manage and control the school property of the district." Other sub-sections clothe the school trustees with the authority to provide school houses, control the educational interests of the districts, and other matters relative thereo. But sub-section 6, from which we quote, is the only provision which has direct relevancy to the issue presented here as to the power of a Board of School Trustees to lease school property. If they have such power, it must be referred to the authority granted to them to "take care of, manage and control the school property of the district."

The doctrine is generally recognized that a school district is a body politic and corporate under the laws of the state, with limited powers confined generally to those expressly enumerated and those necessarily implied. Although in general terms, powers may be broadly given, the character of the corporation itself and the purposes for which it was created supply limitations in view of which the language employed may be read.

It is stated in 47 Am. Jur., Sec. 67, Page 344:

"While there appears to be considerable conflict in the reported cases as to whether school property may be used for other than school purposes, or, if so, as to what uses

are permissible, there is a liberalizing tendency in favor of extending permissible uses. In determining the question, the courts may be governed by the wording and import of statutes prescribing the powers and duties of those charged with the care of school property, or, if the statute is general in nature, by considerations of public policy, depending largely on the attitude of the taxpayers in the district. Other considerations affecting the result may be found in the changing times, or in the historical recognition of the propriety of devoting school property to certain uses.

"According to one line of decisions, taking the more liberal view, school authorities may grant the use of school buildings for other than school uses, provided the primary use of the building for school purposes is not interfered with, particularly where the funds of the district are augmented thereby. But another line of decisions apparently restricts the use of school property strictly and entirely to school purposes, on the ground that money raised by taxation for one purpose cannot be used even indirectly for any other * * *.

"Even in those jurisdictions wherein the use of schoolhouses for other than school purposes is recognized, certain limitations are imposed. Unquestionably, school directors have no authority to permit schoolhouses to be used for any purpose interfering with their use as schools, and any contract providing for such use is void. The courts will be more liberal in permitting collateral uses of public and educational advantage, such as lectures, entertainments, etc., than in permitting those uses which are of strictly private advantage, such as dances, etc."

It is a fact of common knowledge in this state that from our earliest days school property, especially school buildings, by general consent, have been used, outside of school session hours, for a variety of purposes other than the holding of public schools,—such as political meetings, lectures and entertainments of various kinds. And this practice, especially in our smaller towns and rural sec-

tions, still prevails; but it has never been done so as to interfere in any way with the use of the schools and the school property generally. In other words, there has not been and should not be any conflict.

Our attention is directed by respondents to a line of authorities, of which *Royse Independent School Dist. v. Reinhardt* is typical. Tex. Civ. App., 159 S. W. 1010, 1011.

In the above case it appears that the Board of Trustees of the school district were vested by law with the exclusive management and control of its property. The Board, by a contract, granted to a private corporation, the privilege of using the South end of the public school campus as a baseball ground during the period intervening between the close of school in the Spring and the commencement of school in the Fall, and for a term of three years. The contract provided for certain considerations and certain restrictions as to orderly conduct, impairment of school property, etc. The action of the trial court in granting an injunction restraining the trustees from performing this contract was reversed, and it was held that such contract was within the power of the Board to make.

In reversing the trial court, the court stated:

"But, if it may be said that the powers of a school district are ordinarily more restricted than those of cities, and that school property over which municipal corporations have control might be used for a purpose which would be unauthorized if such use was attempted by a school district, the answer here is that the Royse independent school district is attempting no such unauthorized act. The primary object in granting the privilege to the Royse Booster Club to use its school grounds as a place to play baseball is to subserve a public purpose, and not to promote some private end. And it clearly appears that such incidental use of the grounds could in no way impair the school buildings, or interfere in anywise with the orderly and successful conduct of the school.

"The contract under consideration permits the use of the school grounds only during the period of time intervening between the close of the school in the spring and the beginning of the term in the following fall, and will result in quite a financial advantage to the school district. It may be true that the use to which the grounds will be put under the contract is not actually necessary for the promotion of the school, yet, as it will not impede or interfere with its progress, or tend to injure the school property, and will be used at a time when the grounds are not needed and will not be used by the school, such use is not so inconsistent with the purposes to which the property has been dedicated or set apart as renders the contract permitting it illegal or unauthorized."

The court in the *Royse case,* however, was careful to point out that the contract in question would in no way interfere with the orderly and successful conduct of the school; and that the contract permitted the use of the school grounds only "during the period of time intervening between the close of the school in the spring and the beginning of the term in the following fall"; and that the school grounds would be used by the ball club only when they were not needed and would not be used by the school.

It is argued by the respondents that the program of the Lake City Baseball Club and the use of the school athletic grounds for professional baseball, does not impede or interfere with the school or with school activities. But we think that it is implicit in the evidence that there is such interference. Only one athletic field is owned by the Lake City High School for the use of the boys and girls who attend the school. The professional ballplayers on the Lake City Baseball Club take possession of the baseball field early in April for their preliminary practice, looking toward the beginning of their schedule of games; and their playing season opens on May 2nd. The school term ends June 1st, so that during most of April and all of May of the school

session, the use of this field is practically denied to the school children.

In addition to this, the inference is inescapable that the preliminary practice by the professional ball players during the school session in the day time, would necessarily have, with its attendant noise and distraction, a demoralizing effect upon the boys and girls within the school building. We think such practice would necessarily interfere with and prove detrimental to the best interests of the school.

Furthermore, as hereinabove stated, the lease was executed to the Lake City Baseball Club, "for the purpose of, and at the times needed to, play baseball games in connection with its schedule with the Palmetto League and such other extra games as the league may schedule * * *."

It is obvious that there is no restriction placed upon the baseball club as to when they may take possession of the school grounds for their baseball use, and as stated, it is evident that their practice games and their regularly scheduled games conflict with school use, with school practice, and with the school session.

The evidence tends to show that the boys and girls of the high school do not have and could not have the free and unimpeded use of the athletic field during April and May, day or night. The Lake City High School has a baseball team composed of high school players, and they also have games scheduled with other high schools. When they wish to practice or play during these two months, they are of necessity limited by the program and use by the professional ball players of their athletic grounds. It appears that the schedule of games of the high school is so arranged as to avoid conflict, but it is inherent in the testimony, and we think the inference is inescapable, that such conflict is avoided by subordinating the athletic activities of the high school boys and girls to the requirements of the professional players. Certainly the lease gives the use of the athletic field to the Lake City Baseball Club "at the times needed." And neither

the school trustees nor the high school team could invade this right under the contract.

We hold that the school trustees have no power to ■ lease or permit the use of the school athletic field for the playing of professional or semi-professional baseball during the school term of the Lake City High School; and that the lease which we have discussed is null and void.

Many cases bearing upon this point—that is, the use of school property for other than school purposes,—are to be found in the annotations in 86 A. L. R. 1195, 111 A. L. R. 1051; 31 L. R. A., N. S., 588.

The question which remains to be considered is whether the conditions disclosed by the testimony are such as to render the playing of night professional baseball on the school athletic field, a private nuisance.

The playing of the game of baseball is not a nuisance ■ per se, against which persons living in the vicinity where the game is played may necessarily be entitled to equitable relief. But a baseball park may be so conducted, or the game may be played under such conditions as to be a nuisance. *Peden v. Furman University,* 155 S. C. 1, 151 S. E. 907; *Alexander v. Tebeau,* 132 Ky. 487, 71 S. W. 427, 18 Ann. Cas. 1092; 39 Am. Jur., Sec. 72, Page 351.

Very naturally, those who bring the charge of nuisance against the professional playing of baseball at night are those who live in residences on the streets adjoining and adjacent to the school ball field. The nuisance conditions alleged in the case at bar,—all of which are amply supported by the evidence,—are described in detail. They derive from glaring flood lights, loudspeakers, drinking, and other concomitants which are more or less naturally connected with heterogeneous crowds. To be more specific:

(1) There are five or six residences on Dancing Street which face the batter's box, 360 or 400 feet away. An aluminum fence is maintained in front of these homes on

the school property line, which is described as blinding to the eyes. Occupied residences are likewise on Blanding Street to the right of the field, and the rear of these residence lots is only ten feet away from the grandstand and bleachers. These are well kept homes above the average cost, with shrubbery and flowers growing around them.

(2) The professional ball teams play their scheduled games with other teams in the Palmetto League three to five nights a week on the athletic grounds of the Lake City High School. They draw an average crowd of 1,500. And they indulge in preliminary practice games every afternoon during the months mentioned, weather permitting. (3) The floodlights installed on the field cast a glaring light in the residences of the neighborhood, especially on Dancing Street, interfering with the comfort of the occupants and disturbing their rest and sleep. (4) The colored entrance of the athletic field is on Dancing Street immediately in front of the residences located thereon. At this point large numbers of people, white and colored, congregate. (5) Cars and trucks are parked on the street, and people stand on top of the trucks and cars to get a view of the games without having to buy tickets. While so doing they make excessive noise, indulge in profanity, drink beer and whiskey, and throw the empty whiskey bottles and beer cans into the yards of the nearby residences. (6) Numbers of foul balls and home run balls strike the houses on both Dancing and Blanding Streets, and numerous small boys enter and run over the property of the residents on the two named streets, chasing and retrieving the balls for the players. In so doing, they dig into and trample the shrubbery in the effort to find the balls. (7) There are no toilets or toilet facilities for the use of the public on the athletic grounds, in consequence of which the rear of the grandstand and bleachers is used for this purpose, and constitute an intolerable and unbearable situation. (8) The loud speaker, a stationary instrument attached to the rear of the grand stand, is used continuously,

beginning about two hours before the game and running until the end of the game. Over the loud speaker, commercial advertisements are announced, hillbilly music is played, and the progress of the game is reported until its end, which occurs at ten or eleven o'clock in the evening. This loud speaker can be heard and the announcements distinctly understood for a distance of nearly 500 feet. (9) On Dancing Street cars are parked by those attending the night games for several hours, in the driveways leading into the residential property so that the residents have neither ingress nor egress. Sometimes this condition is relieved when at considerable effort the resident whose driveway is blocked, gets an anouncement over the loud speaker requesting the person who has blocked the driveway to go and remove the truck or car. Occasionally this works, but just as often no one arrives to move the cars, and the driveways remain obstructed. Police supervision is utterly inadequate and cannot be improved.

The above described conditions did not exist prior to 1947. They commenced then, and have grown progressively worse. Of the five members of the Board of Trustees, only the chairman testified, and he appeared as an adverse witness pursuant to a subpoena issued by the appellants.

The circuit decree does not hold that these conditions do not exist. The injunction prayed for was denied on the ground that the respondents should have an opportunity to correct such conditions; and certain things were suggested which might be done,—such as correcting the toilet situation, reducing the tone of the loudspeaker, toning down the glaring floodlights, blocking off streets, and placing the entrance for negroes on another street.

Courts of Equity have power, of course, to issue mandatory injunctions to abate existing nuisances, and will do so in a proper case, but the remedy is an extreme one, and should be applied only when legal rights are unlawfully invaded or legal duties are willfully or wantonly

neglected. Ordinarily, a decree should not enjoin more than that which constitutes the nuisance, and should not go beyond the requirements of the particular case. 39 Am. Jur., Sec. 172, Page 443.

The case of *Peden v. Furman University,* 155 S. C. 1, 151 S. E. 907, 912, has been cited by appellants as being in point. That action was for damages, and primarily upon the point of whether an eleemosynary institution, when it uses it property in such a manner as to become a nuisance, is liable for damages. There is a close parallel between the facts of that case constituting the alleged nuisance, and the facts of the case at bar. The plaintiffs in *Peden v. Furman University* allege that balls were frequently batted over the enclosure fence of the ball field on to the premises of the plaintiff, where boys would scramble to recover them. Other items of damages were alleged, such as yards and gardens trampled, the attendance of large crowds of people, blocking traffic, and unbearable noise.

The court after discussing various authorities dealing with the question of what constitutes such a private nuisance as to amount to a "taking" of property, including authorities relating to the overflow of lands, said: "If the throwing of surface water onto the lands of a person, thereby depriving him of the use thereof, amounts to a taking of his property, then certainly the frequent batting of baseballs onto the premises and dwelling house of the plaintiff, the trampling of his garden and his yards, and the other trespasses alleged and testified to by him, to such an extent as to render his premises uninhabitable, and depriving him of the full use and enjoyment of the same, and impairing the value thereof, is a taking of property in contemplation of the constitutional provisions."

While it is true that the foregoing principle was announced as relating to liability for damages by an eleemosynary corporation, it has a direct bearing upon the issue before us.

It is evident that while it might be possible, if the Lake City Basball Club were solvent, and if it were so inclined, to alleviate some of the conditions complained of, it is equally clear that other conditions cannot be remedied or corrected. They amount to a continuing nuisance. It is impossible, for instance, to enlarge the playing field. The ball park is too small for mature professional ball players who have the strength and ability, aided by experience, to bat balls out of the park, either by way of fouls or home runs, onto the premises of complainants. And it is hardly conceivable that the floodlights can be materially dimmed or the volume of the loud speaker reduced.

No complaint of this kind is made of the high school players, whose night play is infrequent. We think, too, that the inference is obvious that a different type of crowd attends high school games, and a great many of the conditions constituting nuisances alleged as a part of the professional league games, do not exist in the school games.

The maintenance of a public playground in such ██ manner that its balls are liable frequently to be propelled therefrom on to adjoining property to the injury of it and the occupants thereof, constitutes a nuisance, and may be enjoined. *Hennessy v. City of Boston,* 265 Mass. 559, 164 N. E. 470, 62 A. L. R. 780.

"While it is undoubtedly the correct rule that a court of equity will not interfere by injunction in cases of nuisances, trespasses, and like injuries to property when the parties can have complete redress in a court of law, still if it appears that irreparable mischief will be done by withholding the process, or where the damages that will result to the complainants are incapable of being adequately measured, or where the mischief is such, from its continuous and permanent character, that it must occasion constantly recurring grievances, which cannot be otherwise prevented, a court of equity ought to interfere by injunction to stay the wrong and protect the complainants' property and personal rights

from hurt or destruction." *Palestine Bldg. Ass'n. v. Minor,* 86 S. W. 695, 696, 27 Ky. L. Rep. 781.

The power of a court of equity to enjoin a baseball park which is so conducted as to become a nuisance was exhaustively considered by the Supreme Court of New Jersey, and in the opinion collecting many authorities, an injunction was sustained. *Gilbough v. West Side Amusement Co.,* 64 N. J. Eq. 27, 53 A. 289, 9 Am. and Eng. Dec. in Eq., 416.

A like conclusion was reached in *Kissel v. Lewis,* 156 Ind. 233, 59 N. E. 478.

It is suggested by respondents that the appellants moved to the nuisance, but the undisputed testimony is that the nuisance conditions which are complained of began in 1947, and substantially all of the homes in this area were in existence and occupied at that time.

"As a rule, it is no justication for maintaining a nuisance that a party complaining of it came voluntarily within its reach. Thus, according to the weight of authority, the fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effects, or by purchasing adjoining property or erecting a residence or building in the vicinity after the nuisance is created, does not prevent him from recovering damages for injuries sustained therefrom, or deprive him of the right to enjoin its maintenance, especially where, by reason of changes in the structure or business complained of, the annoyance has been since increased." 39 Am. Jur., Sec. 197, Page 472.

It appears here that the nuisance conditions commenced in 1947 when the lease was entered into between the school trustees and the Baseball Club.

As stated in the forepart of this opinion, the Baseball Club is insolvent and could not be made to respond in damages. And the trustees of Lake City School District are not amenable to suit. In our opinion, the mischief is such that it cannot be adequately or materially corrected, and from

its continuous and permanent character, it must occasion constantly recurring grievances which cannot be remedied except by the injunctive process of the court. The conditions complained of have existed for three years, and so far as the record shows, nothing has ever been done to correct them.

In expressing our conclusions in the case at bar, we do not wish to be understood as going to the extreme of holding that the school trustees may not make such casual and incidental use of the athletic field in question, not detrimental to the main purpose for which it was created, as they may deem advisable. This opinion is, of course, confined to the particular facts of this case.

It is, therefore, ordered and adjudged that the judgment appealed from be reversed and the case remanded for the issuance of an injunction as prayed for in the complaint, permanently enjoining and restraining the Board of Trustees of Lake City School District from entering into any written or permissive arrangement whereby the athletic grounds in question may be leased for the playing of baseball games of a professional or semi-professional character.

Judgment reversed.

STUKES, TAYLOR and OXNER, JJ., concur.

BAKER, C. J., not participating.