Corey S. CHASE and Kristie A. Chase

v.

ELDRED BOROUGH, Appellant.

Commonwealth Court of Pennsylvania.

Argued May 8, 2006.

Decided July 3, 2006.

Christian T. Mattie, III, Eldred, for appellant.

Raymond W. Bulson, Portville, for appellees.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

The Borough of Eldred (Borough) appeals from the order of the Court of Common Pleas Court of McKean County (chancellor) which enjoined the use of Ron Houben Memorial Park (Houben Park) for baseball games until a fence of "appropriate height" was erected to prevent baseballs from being hit or thrown on to the property owned by Corey and Kristie Chase (the Chases).

On July 8, 2004, the Chases filed a complaint in equity against the Borough to enjoin the use of Houben Park as a baseball field and asserted it was a private nuisance that posed a significant danger to their property and two young children.

At a non-jury trial, testimony disclosed that Houben Park was used for organized baseball for all age levels for the past 50 years. The Chases lived approximately 20 feet from Houben Park and their back yard abutted the first base/right field line. Mr. Chase testified that, when adults and teenagers play baseball, many foul balls and overthrown baseballs landed in their yard and swimming pool. Mr. Chase testified that one baseball destroyed his power lawn mower and another broke the windshield of his father's car.

When the Chases purchased the property there was a row of tall evergreen trees which divided the property from the ball field. Approximately seven years earlier the Chases cut the trees because some of them were dead and the falling limbs and sharp pine needles presented a danger to their two young children and home. The trees, however, were a natural barrier be-

tween the Chase's property and the ball field. With the trees gone there was nothing to stop the foul balls or overthrows from landing on the Chase property.

Mr. Chase and his wife first complained to the Borough in June of 2003. Thereafter, the Borough erected an 8 foot chain link fence on top of the existing 5 foot fence at a cost of $1,926.97. Mr. Chase testified that the current 13 foot high fence had no noticeable effect on protecting their property from errant baseballs. The Chases introduced into evidence 37 baseballs collected on their property during the six month period before the Borough installed the new fence. By the date of trial, the Chases collected another 43 balls.

At the end of trial, the Borough's counsel admitted that baseballs being hit or thrown onto the Chases' property constituted a "nuisance." It maintained however that the Chases "came to the nuisance" when they bought property which abutted a baseball field, and then compounded the problem when they cut down the trees. The Borough further argued that there was no practical location to move the ball field, or reconfigure Houben Park to eliminate the problem. Finally, the Borough maintained that the Chases failed to prove the "cost" of the relief they requested. The Borough, relying on *Weishner v. Washington County Golf and Country Club*, 11 D & C 3d 458 (1979) and *Dexter v. Bebenek*, 458 Pa. 1, 327 A.2d 38 (1974), argued that it was incumbent on the Chases to prove, in their case-in-chief, the cost of avoiding the nuisance because in fashioning a remedy the chancellor was required to balance the seriousness of the injury against the cost of avoidance and the importance of the conduct that caused it.

On September 2, 2005, the chancellor entered a verdict for the Chases. It began its analysis with the Borough's admission

that the baseballs hit and thrown into the Chases' yard constituted a nuisance. The chancellor concluded that the Borough created the nuisance and, therefore, had the duty to abate it regardless of whether the Chases cut down the barrier of trees:

The Borough has acknowledged that it has created a public nuisance. It has developed its property in a way which significantly impairs the adjoining landowners' use and enjoyment of their property. For fifty years, however, the Borough has avoided its duty to abate the nuisance by relying on the good will of the Chases, or their predecessors in title, to maintain a line of trees that grew, not on the Borough's property, but on the property of the adjoining landowner. The Borough cannot be heard to argue its reliance on the goodwill of an adjoining property owner has somehow ripened into a right to expect the property owner will continue to relieve the Borough of an obligation that is lawfully its own.

The shield provided by the adjoining landowner, after all, was growing trees. Given the fact that trees grow, mature and die, the Borough cannot reasonably have relied on the fact that the barrier would have been present in perpetuity. It is not inequitable, therefore, to place the burden now on the Borough to abate the nuisance even though the Chases cut down the trees. It is apparent, after all, the Borough has been relieved of its duty to abate the nuisance for many years by the fact that the adjoining landowners have borne the expense and trouble of maintaining the trees. Therefore, the Borough's cost of abating the nuisance now is offset by the fact that it has been relieved of its duty to do so before.

Chancellor's Opinion, September 2, 2005, at 4.

The chancellor was also not persuaded by the Borough's argument that the Chases "came to the nuisance." The chancellor found that the Chases did not know that baseballs would be hit or thrown into their yard in such numbers and because of the protection afforded by the tree line, it could not be said that they came to an obvious nuisance and chose to ignore it at their peril.

The chancellor made the following conclusions of law.

1. By using its park lands for organized baseball and in a manner that allows hit or thrown baseballs to fall onto the Chases' property, the Borough has created a nuisance which it has a duty to abate.

2. The Borough has no right to burden the owners of adjoining lands with a duty to relieve the Borough of its duty to abate the nuisance for which it is responsible.

3. The Chases did not lose the right to seek equitable relief by cutting down trees growing on their property when they did so in good faith to protect their own property from potential damage or injury the trees presented from falling limbs or dropping needles.

Chancellor's Opinion, September 2, 2005, at 7.

A decree was entered on September 2, 2005, and the Borough was enjoined "from using, or permitting the use of, the base-ball field at Houben Park for baseball games until a fence of appropriate height is erected to prevent baseballs from being hit or thrown onto the property of the plaintiffs [Chases]." Chancellor's Decree, September 2, 2005, at 1.

■ On appeal[1], the Borough contends that the chancellor erred when it issued the injunction because: (1) the Borough is authorized to operate a ball field under the Borough Code[2]; (2) the Chases failed to introduce any evidence as to what would be a fence of appropriate height and the cost to erect such a fence; and (3) the Chases knew before they purchased their home that baseball was played next door and they cut down a natural barrier of trees.

*1. Whether The Borough Code, Which Authorizes the Borough to Provide a Playing Field, Divested the Trial Court of Equity Jurisdiction?*

■ The Borough contends that although Houben Park may "factually" be considered a nuisance, it does not "legally" constitute a nuisance because Section 2701 of The Borough Code, 53 P.S. § 47701, expressly "authorizes" the Borough to provide playing fields.[3] The Borough proposes that once a work or project is legislatively "authorized" it will not later be deemed to be a public nuisance. *Borough of Collegeville v. Philadelphia Suburban*

---

1. With respect to this Court's scope of review of an order granting or denying a preliminary injunction, we will not inquire into the merits of the controversy, but instead we will examine the record only to determine if there were any apparently reasonable grounds for the action of the court below. *James T. O'Hara, Inc. v. Borough of Moosic*, 148 Pa.Cmwlth. 535, 611 A.2d 1332 (1992). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we in-terfere with the decision of the [chancellor]." *Roberts v. Board of Directors of the School District of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975).

2. Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. § 45101–48501.

3. Section 2701 of The Borough Code, 53 P.S. § 47701, provides that "[a]ny borough may provide, improve, maintain and regulate ... playfields ..."

*Water Co.*, 377 Pa. 636, 105 A.2d 722 (1954).

In *Borough of Collegeville*, Philadelphia Suburban Water Company (PSWC) sought to construct a reservoir and dam across Perkiomen Creek. It filed applications for permits with the Water and Power Resources Board (Board) pursuant to the requirements of Section 6 of the Act of June 24, 1939, P.L. 842, *as amended*, 32 P.S. § 636, and the Act of June 25, 1913, P.L. 555, *as amended*, 32 P.S. § 681 *et seq.* PSWC's applications had been supported by detailed plans and specifications including reports on engineering and geology. In accordance with the requirements of the former Administrative Agency Law of June 4, 1945, P.L. 1388, *formerly* 71 P.S. § 1710.1 *et seq.*, the Board held public hearings after which it issued its adjudication and order authorizing PSWC's project. The Board specifically found that the project would not jeopardize public safety or cause any injury to the Commonwealth, but on the contrary would protect a large metropolitan area from the hardship and dangers of a critical water shortage and provide needed conservation of water in the area. *Borough of Collegeville*, 377 Pa. at 642, 105 A.2d at 725.

Numerous residents and surrounding municipalities commenced an action against the PSWC seeking to enjoin the project. They alleged that the dam would have a negative affect on fish production, the community, its roads and bridges, and the health, safety and property of its citizens.

PSWC preliminarily objected on the ground that the trial court had no subject matter jurisdiction. The trial court refused to exercise its equitable jurisdiction and dismissed the complaint. The Supreme Court affirmed. It held that since the Board had authorized PSWC's project through a legislatively mandated process the project could not subsequently be enjoined by a court of equity on the ground that it was a public nuisance. The Supreme Court explained that the reason the legislature had created the Board was "to establish a single tribunal to determine questions of the appropriation and diversion of water from the streams of the Commonwealth" and the Board "[w]ith its staff and facilities, [was] best qualified to secure uniformity in policies and rulings and to adjust conflicting claims to water and water rights." *Borough of Collegeville*, 377 Pa. at 648, 105 A.2d at 728. The Supreme Court held that once the project had been approved by the Board, a court sitting in equity was without jurisdiction to "override" that decision and deem it a public nuisance:

> Here the Water and Power Resources Board, an arm of the Legislature, authorized the project and the exercise of the right of eminent domain for its accomplishment. Where the Legislature has authorized an act, such act cannot constitute a public nuisance although it would otherwise be such, so long as the terms of the authorization are not abused or exceeded. The *Danville, Hazleton and Wilkesbarre Railroad Co. v. The Commonwealth*, 73 Pa. 29; *Commonwealth v. Pennsylvania Railroad Co.*, 78 Pa.Super. 389; 39 Am.Jur., Nuisance, § 204, p. 480. In the *Danville* case, supra, 73 Pa. at p. 38 it was expressly stated: ' * * * A structure authorized by the legislature cannot be a public nuisance. A public nuisance must be occasioned by acts done in violation of law. A work which is authorized by law cannot be a nuisance: * * *'.
>
> *To hold that a court may interfere with or override an adjudication by the Water and Power Resources Board concerned with the allocation of waters in the public interest, except upon review*

*on appeal, would destroy the legislative creation of unified supervision and control of the supply of a necessity of life. Such regulation is for the sovereign in the first instance, not for the judiciary.* *Borough of Collegeville,* 377 Pa. at 655, 657, 105 A.2d at 731, 732 (emphasis added).

*Borough of Collegeville* was clearly not intended to apply to situations, such as this one, where the authority relied upon by the Borough is a simple grant of general power to maintain and improve public parks.

In *Borough of Collegeville* construction of the dam had been approved by the tribunal specifically designated to oversee and manage the Commonwealth's allocation of waters only after PSWC underwent a legislatively-created permit process, which included public hearings and the Board's adjudication of facts. According to the Supreme Court, to permit the trial court to re-examine the suitability or fitness of the project from a public nuisance perspective would "destroy the legislative creation of unified supervision and control of the supply of a necessity of life." *Borough of Collegeville,* 377 Pa. at 653, 105 A.2d at 730.

Here, there was no analogous "authorization" which rises to the level of a legislative adjudication, as existed in *Borough of Collegeville.* The Borough Code, which the Borough equates with the adjudication in *Borough of Collegeville,* does not identify the conditions, manner or requisites of maintaining the playing fields. Although the Borough Code authorizes the Borough *to provide and maintain* a field for use by its citizens, it does not direct the *manner* in which baseball is to be played, and *how*

baseball was played at Houben Park ultimately gave rise to Chases' nuisance allegations. Therefore, this Court will not conclude, as the Borough would have it do, that the chancellor "interfered with" or "overrode" a legislative adjudication. Nor will this court conclude that the chancellor second-guessed a legislative determination as to the suitability or fitness of Houben Park. This Court must conclude that the chancellor correctly determined that *Borough of Collegeville* did not control.

 This conclusion is consistent with case law. The fact that property may be owned or controlled by a municipality does not authorize it to maintain it in such a manner as to constitute a nuisance.[4] *Lawrence v. City of Scranton,* 284 Pa. 215, 130 A. 428 (1925). Also, the basic lawfulness of the act or conduct does not preclude a court of equity from declaring it a nuisance.

These principles were applied by our Superior Court in *Siwak v. Rankin Borough,* 72 Pa.Super. 218 (1919). There residents brought an action against the Borough of Rankin (Rankin Borough) to enjoin the operation of its incinerating plant (plant). The residents complained that the plant gave off noxious and offensive odors that made their homes uninhabitable. There was no question that Rankin Borough had the authority to build and operate the plant. The only question involved was whether it operated and maintained the plant in such a manner that it caused injury to the surrounding community. The Superior Court held that, despite the lawfulness of the plant, the residents met their burden and had

---

4. Municipalities have no immunity from the maintenance of nuisances as distinguished from negligence in the performance of governmental functions. *Anderson v. City of Philadelphia,* 380 Pa. 528, 112 A.2d 92 (1955);

*Boorse v. Springfield Township,* 377 Pa. 109, 112, 103 A.2d 708, 710 (1954); *Berish v. City of Bethlehem,* 76 Pa. D & C 588 (Pa.Com.Pl. 1951).

proved the operation and maintenance of the plant created a nuisance.

*Klein v. Shadyside Health, Education and Research Corp.,* 164 Pa.Cmwlth. 546, 643 A.2d 1120 (1994), is also instructive. In *Klein,* residents who had lived near Shadyside Hospital in Pittsburgh brought an action in equity and challenged the construction, installation and enlargement of a helicopter facility. This Court recognized that an equity action may be pursued to seek injunctive relief against existing or threatened nuisances even if the land, structures or activities that caused the nuisance had been authorized under the zoning procedure, i.e., a land use can have proper zoning approval under an ordinance, but because of the manner of its operation the use may still constitute a nuisance, subject to an equitable remedy. *Id. See also Walker v. Delaware County Trust Co.,* 314 Pa. 257, 261, 171 A. 458, 459 (1934) (Acts of municipal officers who, under zoning legislation, permitted the use of property for what may or may not be a nuisance did not strip the common pleas court of equitable jurisdiction to determine whether a nuisance in fact existed and should have been restrained).

In *Fairview Township v. Schaefer,* 128 Pa.Cmwlth. 79, 562 A.2d 989 (1989), *appeal denied,* 524 Pa. 633, 574 A.2d 73 (1990), this Court addressed whether a court of equity had power to declare a tiger a nuisance in fact, even though the Pennsylvania Game Commission had authorized a township resident to possess the tiger when it issued an "exotic wildlife possession permit." In that case, Fairview Township (Township) had instituted an action to enjoin Dennis Schaeffer (Schaeffer), a resident of the Township, from keeping a live tiger in captivity at his residence. The Township maintained the tiger was a nuisance and a threat to the safety of all persons who lived in the Township. The trial court ordered Schaeffer to remove the tiger from the Township and Schaeffer appealed.

On appeal, Schaeffer relied on the fact that the Game Commission had issued a wild life authorization permit for the tiger. Schaeffer, like the Borough presently, argued that since his possession of the tiger was lawfully authorized, it could not legally be deemed to be a nuisance. This Court upheld the injunction despite the lawfulness of Schaeffer's possession of the tiger.

Although the Borough receives its authority from the General Assembly, our courts have made it clear that a court in equity may intervene to enjoin a lawful act when it becomes a nuisance in fact. Accordingly, the Borough exercised its discretion to provide the ball field, and it was required to maintain it in such a manner that it did not constitute a nuisance. This, the Borough failed to do, and the injunction was properly decreed.

*2. Whether the Chases Were Required to Prove the Cost to Remedy the Nuisance ?*

█ The Borough next asserts that the Chases failed to meet their burden to produce feasible abatement proposals because they failed to prove either how to abate the nuisance or what it would cost the Borough. It contends that this information was necessary for the chancellor to perform its critical function of balancing "the seriousness of the injury against the cost of avoiding it." *Dexter v. Bebenek,* 458 Pa. at 2, 327 A.2d at 39. Again this Court must disagree with the Borough.

It has long been clear that in these controversies that once a nuisance is established the burden is not on the plaintiff, but on the *defendant* to show that the use of the property which causes injury to the complaining property owner is unavoidable or cannot be prevented except by an expenditure which would substantially de-

prive him of the use of his own property. *McCune v. Pittsburgh & Baltimore Coal Co.*, 238 Pa. 83, 85 A. 1102 (1913) (*defendant* failed to establish that the injury was unavoidable, or that to prevent it would necessitate such expense as would deprive it of the use of its property. Therefore, the general rule applied, and defendant was ordered to use its property so as to avoid injury to the plaintiff.). *See also Beecher v. Dull,* 294 Pa. 17, 143 A. 498 (1928); *Commonwealth v. Wyeth Laboratories,* 12 Pa.Cmwlth. 227, 315 A.2d 648 (1974) (recognizing the rule, but declining to apply it to a faultless landowner).

On appeal, the Borough complains that it "could be faced with a substantial cost to try to put up a fence of appropriate height" and "[t]he ability ... to play baseball at Houben Park has now ended as a practical matter."[5] If that was the case, then the burden was on the Borough to prove it at trial. Despite ample opportunity, the Borough failed to establish that the injury was unavoidable, or that to prevent it would necessitate such expense as would deprive it of the use of the ball park. The Borough's evidence established that there were four other playing fields in Eldred besides Houben Park. William Luce, (Luce), the Mayor of Eldred, was asked whether two of those fields which were presently back-to-back could be configured so as to accommodate the older players. Luce testified that it could not be done "unless we did a lot of work." Notes of Testimony, July 14, 2005, at 58; Reproduced Record (R.R.) at 78a. Luce did not testify that it could not be done, or that it would be cost prohibitive, just that it would take "a lot of work." When asked whether it was conceivable to fence the ball field to resolve the problem, Luce testified that he "he did not know how high it would have to be." *Id.* Moreover, the

Borough presented evidence that the cost to date of providing the existing 13–foot fence was only $1,926.97.

Based on the record, it is neither impossible nor cost prohibitive to abate this nuisance. The Borough is more than capable of determining either on its own or by hiring whatever experts or engineers it deems necessary to determine the appropriate height of the barrier necessary to stop baseballs from landing on the Chases' property. This is not a case where the problem defies a solution, or where there is a danger of the Borough being compelled to pursue a potentially vain undertaking. *Compare McCabe v. Watt (No. 1),* 224 Pa. 253, 73 A. 453 (1909).

Under the law an injunction must be carefully tailored to remedy only the specific harm shown and be no broader than needed to prevent reoccurrence of the harm. *King v. Township of Leacock,* 122 Pa.Cmwlth. 532, 552 A.2d 741 (1989). In addition, the remedy selected to abate the nuisance should not be punitive; rather, it should be shaped to correspond to the nature and extent of the nuisance. *Id.* In *Collins v. Wayne Iron Works,* 227 Pa. 326, 76 A. 24 (1910), our Supreme Court explained that a chancellor has a duty to consider alternative means to abate the nuisance:

> Where the facts and equities call for it, a chancellor is required to give relief by injunction; but such injunction should never go beyond the requirements of the particular case; and under no circumstances should a decree be entered the apparent practical effect of which will be to close an industrial plant, if it is possible to frame another form of decree which will give such relief as the plaintiff is entitled to.... In a case like the

5. Appellant's Brief at 13.

present where the annoyance arises from the conduct of a business which is not a nuisance per se, a strong effort should be made to conserve the rights of all the parties; and an important question is, Can the noise by any reasonable means be so moderated as to accord with the degree of quietness the plaintiff has a right to enjoy; and, if it can, by what means?

*Collins,* 227 Pa. at 330, 76 A. at 25.

This Court is satisfied that the remedy fashioned by the chancellor in this case was reasonably calculated to eliminate the potential harm to the Chases and their children while preserving, as much as possible, the Borough's authority to provide a ball field. The chancellor's decree reflected that it properly balanced "the seriousness of the injury against the cost of avoiding it" and concluded that it would be both economically and technically possible to correct the harm by installing a higher barrier. There was no error.

### 3. *Whether the Chases' Action is Barred as a Matter of Law Because They Knowingly Came to the Nuisance?*

Lastly, the Borough contends that the Chases knew or should have known at the time they acquired their house that baseball was played next door, yet they cut down a natural barrier of trees that line their property along the ball field. The Borough asserts the Chases should be estopped from complaining about the nuisance.

This Court believes *Weishner,* relied on by the Borough, is distinguishable on its facts. The Weishners purchased land which adjoined the Washington County Golf and Country Club, a country club had been in existence for 60 years. After they built their home, the Weishners sought to enjoin the club from the use of the number one tee. The Weishners presented an expert who testified that it would cost between $10,000 and $15,000 to reconfigure the course. The Court of Common Pleas of Washington County (common pleas court) denied the injunction and concluded that the Weishners realized, or should have realized, the potential hazard of locating a house in such close proximity to a golf course. The common pleas court took into consideration several factors which are not present here including the fact that during excavation the Weishners found evidence that would warn them of golf balls landing on their property.

*Carter v. Lake City Baseball Club,* 218 S.C. 255, 62 S.E.2d 470 (1950), a case from the Supreme Court of South Carolina is directly on point. In *Carter,* trustees of the Lake City School District leased an athletic field to a semi-professional baseball club. Residents whose homes bordered the field brought an action in equity to enjoin the playing of baseball at night. The residents claimed that the flood lights, noise, unruly crowds and the numerous foul and home run balls batted onto their property by older players, rendered the playing of night baseball on the school athletic field a private nuisance.

The ball club and school district argued as a defense that the residents voluntarily moved to the nuisance. The Supreme Court of South Carolina disagreed:

> [a]s a rule, it is no justification for maintaining a nuisance that the party complaining of it came voluntarily within its reach.... The fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effects ... does not ... deprive him of the right to enjoin its maintenance, especially where, by reason of changes in the structure or business complained of, the annoyance has been since increased.

*Carter,* 62 S.E.2d at 478.

Here, the Chases indeed purchased the property, knowing that it was next

door to a ball field. However, as found by the chancellor, the Chases, unlike the Weishners, did not know that baseballs would be hit or thrown onto their yard in such numbers, and they could not have known because of the protection afforded by their tree line.

In this case, however, the evidence suggests that although the plaintiffs were obviously aware their property adjoined the ball field, they did not know baseballs would be hit or thrown into their yard in such numbers. In fact, it is unlikely they could have known that because of the protection afforded by the tree line. Consequently, it cannot be said that they "came to" an obvious nuisance and chose to ignore it at their peril.

It is true that the Chases purchased their property knowing that it adjoined the Houben Park ball field, and they cut down a row of trees providing protection from balls hit or thrown from the field. Nevertheless, the Chases have the right to the quiet use and enjoyment of their property; and their use and enjoyment cannot be burdened by an obligation to maintain a fence of trees which has the effect of relieving the Borough from its obligation to abate the nuisance.

The Chases cannot be precluded from maintaining or protecting their own property by cutting down their trees simply because by doing so they may aggravate the consequences of a nuisance for which they are not responsible.

Decree, September 2, 2005, at 5–6.

This Court also agrees with the chancellor's treatment regarding the dead and/or dying evergreen trees. The trees were over forty years old. They were dropping their branches and needles. It would be unreasonable to force the Chases to live on a property surrounded by dead or dying trees, which may or may not have been the lesser of the two evils.

Finally, even if the chancellor found as a fact that the Chases knew or should have known of the nuisance before they purchased their home, it would not necessarily or automatically bar their entitlement to relief. Each case must be considered on its own facts and whether a plaintiff "came to the nuisance" is only one factor to consider.

For example, in *Guarina v. Bogart*, 407 Pa. 307, 180 A.2d 557, 562 (1962), our Supreme Court ordered the owner of a drive-in theater with broadcast speakers to install individual automobile speakers to ameliorate a nuisance, since the individual speakers could reduce the offending noise. The fact that adjoining property owners knew of the operation of the theatre before they acquired their properties was immaterial because the drive-in could for a reasonable cost equip the theatre with individual automobile speakers.

In *Mish v. Elks Country Club*, 35 Pa. D. & C.3d 435 (1983), Mish owned a home adjacent to the defendant's golf course. Mish acknowledged that protective netting had been erected and was visible when his home was purchased. The netting had deteriorated so that it was no longer effective in keeping golf balls off the Mish property. In holding in favor of Mish, the court applied a balancing test; it weighed the seriousness of the injury against the cost of avoiding it and the importance of the conduct that caused it. The court noted that when Mish purchased the property, the protective netting was in place, and that Mish had relied on the country club to keep the netting in good repair.

Given the facts in this case, the chancellor had a reasonable basis to grant the injunction, and, accordingly, the decree is affirmed.

## ORDER

AND NOW, this 3rd day of July, 2006, the order of the Court of Common Pleas of McKean County in the above-captioned case is hereby affirmed.